UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,      .  Case No. 1:09-cr-030-1
                               .
         Plaintiff,            .
                               .  *Change of Plea*
    - v -                      .
                               .  Monday, May 11, 2009
CHRISTOPHER FREEMAN,           .  3:23 PM
                               .
         Defendant.            .  Cincinnati, Ohio
. . . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL R. BARRETT


For the Plaintiff:      TIMOTHY D. OAKLEY, ESQ.
                        Assistant U.S. Attorney
                        United States Attorney's Office
                        221 East Fourth Street, Suite 400
                        Cincinnati, Ohio  45202


For the Defendant:      RICHARD W. SMITH-MONAHAN, ESQ.
                        Federal Public Defender's Office
                        Chiquita Center
                        250 East Fifth Street, Suite 350
                        Cincinnati, Ohio  45202


Also present:           Mr. & Mrs. Thomas P. Freeman
                        Laura S. Jensen, Probation Officer
                        John Scott, ATF


Courtroom Deputy:       Barbara A. Crum

Court Reporter:         Luke T. Lavin, RDR, CRR
                        838 Potter Stewart U.S. Courthouse
                        100 East Fifth Street
                        Cincinnati, Ohio  45202

*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

P R O C E E D I N G S

(In open court at 3:23 PM.)

COURTROOM DEPUTY:  Please be seated.

THE COURT:  Hi, guys.  How you doing?

MR. SMITH-MONAHAN:  Hi, Judge.

THE COURT:  You'll have to give me a second.  Barb is getting my materials.

All right.  Do counsel want to enter their appearances for the record, please.

MR. OAKLEY:  Good afternoon, Your Honor.  Tim Oakley for the United States.

MR. SMITH-MONAHAN:  Richard Smith-Monahan on behalf of the defendant Christopher Freeman.

THE COURT:  You're Mr. Freeman; correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  It's my understanding that the parties are prepared to proceed under Count 1 of the Indictment; is that correct?

MR. OAKLEY:  That's correct, Your Honor.

MR. SMITH-MONAHAN:  Yes, Your Honor.

THE COURT:  All right.  Richard, your client had previously entered on his behalf a not guilty plea.  Would you like to make a motion with regards to the previously entered plea?

MR. SMITH-MONAHAN:  Yes, Your Honor.  We'd move to

withdraw Mr. Freeman's previously entered plea of not guilty to Count 1 of the Indictment and to change that to a plea of guilty.

THE COURT:  Mr. Freeman, when you were initially charged in this case, did you receive a copy of the Indictment, the piece of paper --

THE DEFENDANT:  Yes, sir.

THE COURT:  -- that said what the crime was?  And did you discuss that with your attorney?

THE DEFENDANT:  Yes, sir.

THE COURT:  Did you discuss what the maximum possible penalties were under the Indictment?

THE DEFENDANT:  Yes, sir.

THE COURT:  And did you discuss the charges with him?

THE DEFENDANT:  Yeah.

THE COURT:  And did he tell you what kind of evidence the government had against you to prove their case?

THE DEFENDANT:  Yes, sir.

THE COURT:  So did you guys talk about any possible defenses you may have, did you talk about the facts the government have, and as a result of all of that discussion, is it your intention to enter a plea today?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Do you wish to withdraw your plea of not guilty and enter a plea of guilty to Count 1 of the

1    Indictment?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  All right.  The Court is going to allow

4    you to withdraw your not guilty plea, and I'll ask you, how do

5    you plead to Count 1 of the Indictment, guilty or not guilty?

6           THE DEFENDANT:  Guilty.

7           THE COURT:  All right.  Before I accept the plea,

8    though, I have to ask you a number of questions to make sure

9    that what you're doing here today is done with your complete

10   knowledge and understanding of all the facts and circumstances.

11   Okay?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  All right.  In order to do that, I'm going

14   to have you sworn in, and I'm going to tell you, once you're

15   sworn in, if you say something to me that's wrong, you could be

16   charged with a misstatement of fact, and if you were to tell me

17   something that was an out-and-out lie, you could be charged

18   with perjury.  So are you okay with that, telling the truth?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Okay.

21      Barb, do you want to swear Mr. Freeman in.

22          COURTROOM DEPUTY:  Sir, could you raise your right

23   hand.

24      (Christopher W. Freeman was duly sworn by the courtroom

25   deputy.)

1    THE COURT:  Chris, do you have a middle name?

2    THE DEFENDANT:  Wayne.

3    THE COURT:  Wayne.  So that's your full name:

4  Christopher Wayne Freeman?

5    THE DEFENDANT:  Yes, sir.

6    THE COURT:  And can you read and write?

7    THE DEFENDANT:  Yes, sir.

8    THE COURT:  How old are you now?

9    THE DEFENDANT:  21.

10    THE COURT:  How far did you go in school?

11    THE DEFENDANT:  To tenth grade.

12    THE COURT:  Where did go to school?

13    THE DEFENDANT:  Felicity-Franklin High School.

14    THE COURT:  And where is that?

15    THE DEFENDANT:  Felicity.

16    THE COURT:  And that's?

17    THE DEFENDANT:  Clermont County.

18    THE COURT:  Clermont County, okay.

19    THE DEFENDANT:  Yeah.

20    THE COURT:  Have you ever been treated for any kind of

21  substance abuse?

22    THE DEFENDANT:  No.

23    THE COURT:  How about any type of mental illness?

24    THE DEFENDANT:  No, sir.

25    THE COURT:  Have you taken any kind of medications,

drugs, alcohol, anything at all in your system that would

affect the way you would understand -- in the last 24 hours

that would affect the way you would understand the proceedings

today --

        THE DEFENDANT:  No, sir.

        THE COURT:  -- my questions and your answers?

        THE DEFENDANT:  No, sir.

        THE COURT:  Richard, do you have any doubt as to your

client's competency at this time?

        MR. SMITH-MONAHAN:  I do not, Your Honor.  I would

comment he has had a significant drug problem, but he's been

incarcerated since the initial appearance and has dried out

from that.  But at this point I believe him to be fully

competent.

        THE COURT:  Okay.

Chris, I'd asked you if you understood the charge of Count

1.  I just want to go over that for you.  Count 1 of the

Indictment is receiving stolen firearms.  It's a violation of

United States Code, 18 U.S.C. 922(j) and 18 U.S.C. 924(a)(2)

and 2, and it covers a potential penalty of up to ten years in

prison.  Do you understand that?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  A possible fine of up to a quarter million

dollars:  $250,000.  Do you understand that?

        THE DEFENDANT:  Yes, sir.

THE COURT:  And if there's a term of imprisonment, there will be a term of supervised release which follows that, and that could be up to three years.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And in any criminal case for any count of an indictment for which there is a guilty finding or a plea of guilty, there's a $100 special assessment.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, I just told you what the penalties were in this case, and had you gone to trial and been convicted of Count 1, you'd be looking at the same maximum possible penalty.  So you're basically in the same boat as if you'd been convicted by a jury.  Okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Because this is a felony, there are certain civil rights that you're going to lose. You'll never be permitted to own or possess a firearm or dangerous ordnance.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  There may be some period of time in which you will not be able to vote.  Okay?

THE DEFENDANT:  Okay.

THE COURT:  And you may also be barred from holding some types of public employment or public office as a result of

this conviction. All right?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you believe that you and Richard have had full conversations about all the facts and circumstances surrounding this case?

THE DEFENDANT: Yes, we have.

THE COURT: And are you satisfied with his advice and representation at this point?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I had mentioned before about supervised release, and what that is, is if there's a term of incarceration that results from this offense, supervised release is a period of time after the incarceration -- they used to call it parole in the old days, but now it's called supervised release -- and it's for a period of time, and I'll decide what that period of time is at the time of sentencing. But if there's a violation of the terms and conditions of supervised release, you could be sentenced for the remainder of the term or you could be sentenced for the entire term.

So, for example, if I put you on three years of supervised release, let's say you're doing fine for two years and you catch some paper, if it's something serious, you know, I can do a couple things. I can do nothing, but if it's serious I can say, okay, you've got to go serve a year. If it's serious enough, I could say you've got to do a full three years.

1    Are you okay with that?

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  Okay.  Let's talk a little bit about the

4    Sentencing Guidelines.  The Sentencing Reform Act of 1984

5    established guidelines that judges like me were required to

6    follow at that time.  It basically had to do with what the

7    Sentencing Guidelines said.  And based upon a recent Supreme

8    Court decision, we don't have to follow the Guidelines, but we

9    do have to consider them when arriving at a proper sentence.

10        So the Court will consider the Guidelines that are put in

11   the presentence investigation but will also consider other

12   relevant factors.  And I'm limited by a standard of

13   reasonableness and also by the maximum term of imprisonment

14   provided by the code by this offense of conviction.  Okay?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  All right.  I could do something that's

17   more severe or less severe than what the Guidelines indicate

18   should be done.  Are you okay with that?

19        THE DEFENDANT:  Yes, sir.

20        THE COURT:  All right.  You're not going to be able to

21   really have an idea of what kind of sentence you would have

22   until the completion of the presentence investigation.  What

23   will happen is, after we're finished here today, a presentence

24   investigation officer will interview you and put together the

25   facts of this case, and they'll talk with Mr. Oakley and talk

1  with Richard about the situation, and only after that is

2  completed will something get to me.  But before it gets to me,

3  they'll send a draft copy to both Richard and to Mr. Oakley,

4  and they'll discuss any objections they have with the officer

5  and they'll try to resolve them.  If they can't, then they'll

6  file formal written objections, and either at or before the

7  time of sentencing we'll either have a hearing or we'll discuss

8  those in open court and make rulings on the objections.  Okay?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Okay.  Sometimes the lawyers agree on

11 sentences; sometimes they don't.  Sometimes they agree on facts

12 that went into the presentence investigation; sometimes they

13 don't.  But whatever they do is not binding on me.  I can look

14 at the whole report; I can look at all the facts and

15 circumstances.  As long as what I do is based upon evidence and

16 reasonableness, I can do what I want to do.  Are you all right

17 with that?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Okay.  Tim, is there a waiver of appellate

20 rights in this case?

21         MR. OAKLEY:  Yes, sir, there is.  It's paragraph 10.

22         THE COURT:  Thank you.  Can you handle that for us?

23         MR. OAKLEY:  Yes, Your Honor.

24     Paragraph 10 states that "The defendant understands that he

25 has the right to appeal the sentence imposed in this case

pursuant to 18 U.S.C. 3742.  In exchange for the agreement of

the United States as set forth in paragraphs 1 and 2 above, the

defendant hereby waives all rights to appeal the sentence

imposed, except for the grounds that (a) the sentence includes

a term of custody that exceeds the maximum Guideline

imprisonment range, or (b) the sentence exceeds the statutory

maximum penalty.  The defendant further understands that the

United States reserves its rights to appeal the sentence

imposed as set forth in 18 U.S.C. 3742(b).  However, if the

United States appeals the defendant's sentence, then the

defendant" is or "shall be released from the above waiver of

appellate rights."

     THE COURT:  Richard, is that your understanding of the

waiver of appellate rights in this Plea Agreement?

     MR. SMITH-MONAHAN:  Yes, Your Honor.

     THE COURT:  And, Mr. Freeman, is that also your

understanding?

     THE DEFENDANT:  Yes, sir.

     THE COURT:  Okay.  The Plea Agreement also provides

for the forfeiture of a number of items that were involved in

this case.  And you understand that and you realize you're

going to lose all right, title or interest you may have had in

those items, which are mainly firearms, right?

     THE DEFENDANT:  Yes, sir.

     THE COURT:  Okay.  Is probation a possibility in this

1  case?

2          MR. SMITH-MONAHAN:  It's --

3          MR. OAKLEY:  It's a Guideline range, Your Honor.

4          THE COURT:  Okay.

5      You are eligible for probation, but understand that doesn't

6  mean you're going to necessarily get it.  I'm going to look at

7  the things we talked about in the Guidelines and the sentencing

8  factors and the facts in this case, and then I'll determine

9  whether or not it's appropriate.  Okay?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  All right.  I do want to talk a little bit

12  about the right to a jury, which by proceeding today you're

13  saying you wish to give up.  Obviously, you have Richard here

14  with you at this time, so you're aware that you have the right

15  to be represented by counsel at this stage of the proceeding

16  and at a trial if we were to have one.  All right?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  And if you wanted to have a trial, you

19  could stick with your not guilty plea and we'd have a public

20  and speedy trial in front of a jury of 12 people.  Do you

21  understand that?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Okay.  And if there were such a trial,

24  you'd have the right to assistance of counsel.  That means

25  Richard or another lawyer could make an opening statement for

you, could make a closing argument, could cross-examine the
government witnesses, could challenge their documents, and
introduce evidence that they thought was appropriate.  Do you
understand that?

            THE DEFENDANT:  Yes, sir.

            THE COURT:  And if there are witnesses who you thought
were helpful and Richard could get a subpoena served on them,
then we'd compel them to come to court.  Okay?

            THE DEFENDANT:  Yes, sir.

            THE COURT:  And if there were such a trial, nobody
could make you testify unless you wanted to.  In other words,
Mr. Oakley could not call you in his case.  The only way you'd
end up on the witness stand would be if you and Richard thought
it was in your best interest to testify.

      Are you okay with that?

            THE DEFENDANT:  Yes, sir.

            THE COURT:  All right.  The burden of proof in a
criminal case is beyond a reasonable doubt.  What that means
is, you're presumed innocent until Mr. Oakley would introduce
evidence as to each and every element of the offense that would
establish your guilt beyond a reasonable doubt.  And I'm sure
you've had discussions with Richard about what that means and
you're familiar with that term, right?

            THE DEFENDANT:  Yes, sir.

            THE COURT:  Okay.  There's one other right that people

charged with crimes have that you have to give up to go forward

in this case, and that is the right not to incriminate

yourself. And the reason for that, Chris, is because I need to

understand what the facts are, and to understand the facts, Mr.

Oakley is either going to read a statement or have an agent

read a statement of facts, and at the end of that I'm going to

ask you if those are correct or incorrect. And if you say

they're correct, that almost certainly is going to mean that

you're admitting to a crime, because I've never seen it happen

where Mr. Oakley doesn't read an offense. Okay?

So that means you have to waive up your right to

incriminate yourself and have to admit that you have, in fact,

committed a crime. Are you all right with that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Mr. Oakley and Richard, I've

had a quick look at the Plea Agreement in this case, and I

think I've covered paragraph 1. I think I've covered paragraph

3, 5, and I've talked a little bit about 14. Tim, so if you

want to go through that in more detail, you can, but will you

cover whatever you think I've missed.

MR. OAKLEY: I will, Your Honor.

To summarize the Plea Agreement, the Court has discussed

much of it, but it states, in summary, as paragraph 2 is that

once the plea is accepted and not withdrawn, the United States

will limit the charges against Mr. Freeman in this matter to

the one count as set forth.

The Court discussed 3.

Paragraph 4 is the acceptance of responsibility reduction. The United States recommends that he receive a reduction of two levels for acceptance of responsibility. Should he continue to do so through the time of his sentencing, the United States will notify the Court of his timely notification of the authorities of his intention to plead guilty.

The Court's discussed 5 and, I believe, 6. And 7, which is 7 notifies him of the Court's intention to question him and the potential of prosecution.

8 is by signing the document, Mr. Freeman acknowledges the truth of the attached statement of facts.

9. In the event that Mr. Freeman does not plead guilty, he understands and agrees that by the filing of the Plea Agreement he hereby waives any protection afforded by Section 1B1.8(a) of the Guidelines, Rule 410 of the Rules of Evidence, and Rule 11(f) of the Federal Rules of Criminal Procedure, and that any statement made by him as part of the plea discussions or as part of his cooperation with the government will be admissible against him, including but not limited to, the government's case-in-chief, as a joint exhibit without any limitation in any civil or criminal proceeding.

We have discussed paragraph 10.

Paragraph 11 is that no promises have been made to Mr.

Freeman that he will receive probation or a lighter sentence on

account of his plea of guilty. He understands that the

sentencing guideline recommendations and stipulations that are

set forth in the agreement do not bind the Court. Should the

Court not follow those recommendations, he does not have the

right to withdraw the guilty plea. He will be assessed a

special assessment of $100. He will agree to forfeit any right

to the weapons as named in paragraph 14.

And those weapons were stolen, Your Honor, so I don't

believe he had any real title to those anyway.

THE COURT: Okay.

MR. OAKLEY: Finally, Your Honor, paragraph 15 is that

the written Plea Agreement embodies all of the agreements and

understandings between the United States Attorney for the

Southern District of Ohio and the defendant Christopher

Freeman. No conversation, discussion or understanding, or any

other documents extraneous to the Plea Agreement, shall be

considered to be part of the Plea Agreement.

THE COURT: Chris, will you look on page 6 of that

document. Do you have that in front of you?

THE DEFENDANT: Yeah.

THE COURT: There's a signature line for your name.

And is that your signature that appears above that?

THE DEFENDANT: Yes, sir.

THE COURT: And did you sign that because that is your

understanding of the Plea Agreement as contained in the

document and as summarized by myself and Mr. Oakley?

THE DEFENDANT:  Yes, sir.

THE COURT:  And, Richard, do you agree with that?

MR. SMITH-MONAHAN:  Yes, Your Honor.

THE COURT:  Okay.

Mr. Freeman, other than what's in there -- Mr. Oakley

indicated the government was going to make certain

recommendations not to pursue other offenses and the other

items that they mention there.  Other than what's in the Plea

Agreement itself, has anybody promised you anything else about

how you're going to be treated by me or by anybody else in this

proceeding in order to get you to plead guilty today?

THE DEFENDANT:  No, sir.

THE COURT:  On the other side of the coin, has anybody

threatened you with anything else in order to get you to plead

guilty here today?

THE DEFENDANT:  No, sir.

THE COURT:  Okay.  Mr. Oakley, do you have somebody,

or are you going to read the facts?

MR. OAKLEY:  Agent John Scott from ATF is here.

THE COURT:  Agent, could you come forward, please.

Richard, do you want the agent sworn, or is an unsworn

statement all right with you?

MR. SMITH-MONAHAN:  We have no objection to it being

1    unsworn, Your Honor.

2            THE COURT:  Okay.

3        Agent, could you please state your full name, spell your

4    last name, and give us your duty assignment, please.

5            AGENT SCOTT:  John Scott, S-c-o-t-t, Cincinnati ATF.

6            THE COURT:  Thank you.

7            AGENT SCOTT:  On or about February 12th, 2009, the

8    Arcade Antiques Gun Store, a federally firearms licensed

9    dealership located in Bethel, Ohio, was broken into and

10   approximately 35 firearms were stolen.  The investigation

11   revealed that defendant Christopher Freeman and William Roehm

12   were involved in the disposal of the firearms.

13       On February 13th, 2009, Roehm contacted an agent from the

14   Bureau of ATF.  The agent was posing undercover as a buyer for

15   the stolen firearms.  The agent was contacted by Roehm and was

16   offered a chance to purchase a portion of the weapons for

17   $1,200 in U.S. currency.  Agents met Roehm at the Red Roof

18   Motel located at 4035 Mount Carmel-Tobasco Road in Cincinnati,

19   Ohio, where they purchased eight of the stolen firearms for the

20   prearranged $1,200.  Roehm told the agents that the weapons

21   were hot and that he -- Roehm -- had touched a couple of the

22   firearms and had wiped the prints off the guns.

23       After that purchase, a meeting was arranged with

24   Christopher Freeman to purchase more of the weapons.  Freeman

25   met another undercover ATF agent at a nearby gas station

located at the intersection of State Route 125 and 133. At the meeting Freeman received cash. Roehm had been paid for the eight weapons previously purchased by the ATF and went on to discuss the sale of other firearms. Freeman then sold three more of the firearms to Special Agent Chard for an additional 370 in U.S. currency.

At the time Freeman offered Special Agent Chard and additional amount of firearms but claimed to have to travel to another location to have to obtain the weapons. Freeman left the agent at the point to purportedly retrieve the additional weapons when contact was lost between Freeman and the agent.

The recovered firearms were checked against the stolen inventory of the Arcade Antique Gun Store and found to be, in fact, stolen from the store on February 12, 2009. At the time of the theft and recovery of the firearms, the weapons in question as previously described in the Indictment and Plea Agreement had traveled in and affected interstate commerce, and the defendants Christopher Freeman and William Roehm had reasonable belief that the firearms were stolen at the time the two men possessed and disposed of them to the agents.

THE COURT: Okay. Chris, could you look at page 8 of the Plea Agreement, which is the second page of the statement of facts. And once again, there is a signature line that purports to have your signature. And is that your signature above that?

1          THE DEFENDANT:  Yes, it is.

2          THE COURT:  And did you sign that because the

3    statement of facts as typed out and as summarized by Agent

4    Scott are correct?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Were the statements made by him in any way

7    incorrect?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  So are you offering to plead guilty here

10   today because you are, in fact, guilty of the offenses charged

11   in Count 1 of the Indictment?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  In light of all the conversations

14   we've had about your rights and the facts in this case, I'll

15   ask you for the final time, how do you wish to plead to Count 1

16   of the Indictment, guilty or not guilty?

17         THE DEFENDANT:  Guilty.

18         THE COURT:  I've had the opportunity to observe your

19   appearance in court today.  I've also observed the

20   responsiveness that you've had to the questions that I've been

21   asking, and based upon my observations and the answers you've

22   been giving me, the Court is satisfied that you're in full

23   possession of your faculties.  You're not now suffering from

24   any apparent physical or mental illness.  You're not now under

25   the influence of narcotics or alcohol.  You do understand the

nature of the proceedings in which we're engaged and the
meaning of the charges and the consequences of the plea and of
the Plea Agreement and the negotiations undertaken on your
behalf.

Therefore, the Court finds that Christopher Wayne Freeman
is fully competent and capable of entering an informed plea,
and the Court further finds that the plea of guilty is a
knowing and voluntary plea supported by an independent basis in
fact containing each of the essential elements of the offense
charged, all of which occurred in the Southern District of
Ohio.  Therefore, the Court will accept the plea and make a
finding of guilty at this time.

Christopher, I had mentioned before a little bit about the
presentence investigation.  We have a local rule called 102
which governs the conduct of the parties, including you, during
the course of the presentence investigation.  The probation
officer will be coming to interview you, and Richard should be
with you when you give that statement to them.  Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I've told you before what happens.
They'll put a rough draft out to the lawyers.  They'll discuss
it with the probation officer first, and if there's any
problems, then I'll end up dealing with them either before or
at the time of sentencing.  Okay?

THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.

2      Anything as to the custodial status we need to discuss now,

3  or not?

4          MR. SMITH-MONAHAN:  I would like to have the Court to

5  review the issue of bond.  I don't know if you -- did you

6  receive the pretrial report in this case?

7          THE COURT:  Yeah, I do.

8      Okay.

9          MR. SMITH-MONAHAN:  Pretrial recommended him being

10  released on bond.  The magistrate did not agree with that and

11  held him.  But we would like to ask Your Honor to review that

12  matter.

13      Pretrial, based on his minimal record -- you can see he

14  only had two prior contacts with the law.  He's lived with his

15  parents for 12 years, according to the pretrial report.  I

16  think some of the concern at the initial was his drug usage.

17  He has now had a couple of months to dry out at the Butler

18  County jail.  He was coming down off of a heroin problem.

19      So we'd suggest at this point he's a good candidate for

20  bond given his minimal record, given his acceptance of his

21  responsibility here.  I don't think the Guidelines are going to

22  call for a tremendously long sentence in this case.

23      His parents are here sitting in the courtroom.  You may

24  even want to speak with his father.  He's got a pretty solid

25  plan on keeping his son out of trouble while this is pending.

His parents agreed with pretrial to act as third-party

custodians for him.  He could be, I think, on house arrest.

    You've got a telephone there?

        MR. THOMAS P. FREEMAN:  (Nods head up and down.)

        MR. SMITH-MONAHAN:  He could be on electronic

monitoring with them.  If you want to talk to his dad, I can

tell you he's pretty committed to Christopher not getting into

any trouble, any more trouble while this is pending.

        THE COURT:  Let me hear from Mr. Oakley first and then

we'll hear from Mr. Freeman.

        MR. OAKLEY:  Your Honor, we had argued against the

release of Mr. Freeman.  At the time he had had no contact with

his father for a couple of weeks.  According to the report,

they had been into a fight, and he left.  Further, there was a

substantial drug usage.

    Notably, his drug habit cost between 560 and over a

thousand dollars a week, and that just simply wasn't supported

by any type of occupation.  So it's our feeling that he had to

engage in other activities to pay for that habit.

    Finally, Your Honor, at the time of Mr. Freeman's arrest

he'd been a fugitive for about a week.  He knew that the police

were looking for him and we could not locate him.  We don't

think that, based on the overall circumstances -- and the Court

agreed -- that he was a candidate for pretrial release.

        THE COURT:  We're dealing with a co-defendant as well,

right?

COURTROOM DEPUTY:  Correct.

THE COURT:  And is he locked up or --

MR. OAKLEY:  Yes.

THE COURT:  He's locked up.

MR. SMITH-MONAHAN:  I don't know his record, but I think the co-defendant has some criminal record, though.

MR. OAKLEY:  In fairness, Your Honor, Mr. Roehm, the co-defendant, does have a substantial record.

THE COURT:  Okay.  Can I hear from Chris' dad, though.

MR. SMITH-MONAHAN:  Do you want him to come up, Judge?

THE COURT:  Sure.

Sir, if you could just come on up, speak into the microphone, speak slowly.  Just state your full name.

MR. THOMAS P. FREEMAN:  Thomas P. Freeman.

THE COURT:  Okay.  Mr. Freeman, here's the deal.  We see this all the time:  guys that are in situations involving drugs and they want to get out and they get out and then something happens between now and the time of sentencing because they just can't help themselves and they have to, you know, go find some coke or crack or whatever it is, or sometimes just, you know, marijuana and alcohol, and they end up in a worse position than they are right now.

From what Richard has said, Chris is not -- you know, obviously he's been drugfree since he's been in jail, and I

just -- I mean, tell me what you plan on doing to make sure that he doesn't end up in a worse situation. Because right now he's got a -- and going into the sentencing he'll have a fairly stable situation. I mean, jail's not the best place in the world to be, but it is stable. And I just want you to tell me what you're going to do to make sure that he doesn't screw himself up between now and then.

MR. THOMAS P. FREEMAN: Well, sir, I'm unemployed due to a back injury.

THE COURT: Uh-huh.

MR. THOMAS P. FREEMAN: And I do a little bit of side work on the side, so I'm home pretty much all the time, and I could give you a hundred percent guarantee that Mr. Chris is going to be underneath my supervision.

THE COURT: Does he listen to you?

MR. THOMAS P. FREEMAN: Oh, he's going to listen to me.

THE COURT: Okay.

MR. THOMAS P. FREEMAN: Yes.

THE COURT: And where do you guys live?

MR. THOMAS P. FREEMAN: I live at 197 Felicity Cedron Road. That's southern Clermont County.

THE COURT: Okay. And you've got a landline telephone and all that?

MR. THOMAS P. FREEMAN: Yes, sir.

1          THE COURT:  If I let him out, any special

2    recommendations we'd want?  Obviously, we'd want frequent drug

3    testing, right?

4          MR. SMITH-MONAHAN:  Pretrial laid out a pretty

5    extensive list of recommendations, Your Honor.

6          COURTROOM DEPUTY:  Judge, it's on the last page here.

7          THE COURT:  Oh, I've got it.  Sorry.  I was one page

8    short.

9       (The Court and courtroom deputy confer privately.)

10         THE COURT:  Chris, let me ask you this.  I know you

11   want to get out of jail, right?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Do you really think it's the smartest

14   thing for you to do now?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  Because I mean, seriously, if you step off

17   the deep end again and screw up and catch another case, it

18   changes the whole direction this case is moving in.

19         THE DEFENDANT:  Sir, the first week I was in jail I

20   was -- I didn't -- it was the worst week of my life coming down

21   off the dope, the drugs.  I don't want to go through that

22   again.

23      So I can pretty much guarantee, if I've got to take a drug

24   test whenever you recommend, I will.  I'll be glad to.  But I

25   can guarantee you I won't make my situation any worse than what

1    it is now.

2           THE COURT:  Can you get the job back?  Where were you

3    working, at a gas station for a while?

4           THE DEFENDANT:  No, I wasn't.  I wasn't working at

5    all.

6           THE COURT:  I thought you worked for Valvoline or

7    something like that.

8           THE DEFENDANT:  Oh, yeah.  I did.  I worked there for

9    like six months.

10          THE COURT:  Is there any chance you can find a job?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Because I just don't want you laying

13   around the house all day.

14          THE DEFENDANT:  Yeah.  That was my plan if I got out,

15   was to get a job, to find me a job.

16          THE COURT:  I mean, do you have any ideas, or are you

17   just --

18          THE DEFENDANT:  Yeah.  Well, I was going to check that

19   out, the Valvoline, but I think there was a thing like once you

20   lose that job, you can't reapply for it after so long.  I don't

21   know what that's called.

22        But I was going to go uptown to IGA.  It's in Felicity.

23   It's probably like two miles from my house.  And I know the

24   owner of it.  I was going to see if she'd give me a job.  I was

25   just going to hit up the little businesses around me.

THE COURT:  Okay.  All right.  I'm going to release
you at this time on bond with the following conditions.  You're
to report to pretrial services on a schedule determined by the
supervising officer.  You are to have absolutely no alcohol of
any kind, no narcotic substance of any kind, no other
controlled substances.

If, in fact, you need to get some kind of medication as a
result of some type of an illness and a doctor indicates that a
prescription is what you need, then you're to talk to the
probation officer before you take any medication.  All right?

THE DEFENDANT:  Yes, sir.

THE COURT:  You're going to submit to whatever drug
testing and breath testing that they insist, so they can ask
you to do a sample at any time.  You're not to engage in
anything that would obstruct the accuracy of that test.  If
they want you to have a substance abuse evaluation or
participate in any treatment, you've got to comply with
pretrial services on that.

You're to actively seek and try to get employment and
provide verification to pretrial services of one of two things.
Well, actually, of two things.  The first one is your efforts
to get a job.  All right?  Tell them what you're doing.  And
then second, if you get a job, you have to tell them where it
is.

Absolutely no firearms, dangerous weapons, and no contact

with any of the known convicted -- no contact with the other

people involved in this case nor with any known convicted

felons.  All right?

THE DEFENDANT:  Yes, sir.

THE COURT:  You're to live at 197 Felicity --

Is it Cedron (pronouncing) Road?

THE DEFENDANT:  Cedron.

THE COURT:  -- Cedron Road in Georgetown, Ohio, with

your parents.  They're agreeing to serve as third-party

custodians.  And there's no recommendation here for a monitor,

so I guess we'll just take it the way it is now.

MR. SMITH-MONAHAN:  Whatever you'd like, Judge.  We

can do that whichever way you'd prefer.  I didn't realize they

hadn't recommended it, either, until you read them.

THE COURT:  Yeah.

MR. SMITH-MONAHAN:  So I don't know where it is in

the -- we don't have anyone from pretrial here.

MR. OAKLEY:  Yeah.  We would ask that, if he's going

to be released, that it ought to be on a monitor.

THE COURT:  Okay.  Probably, to save you from

yourself, it's an appropriate idea.  So we'll ask for

electronic monitoring in this situation.  And he's not to be

released until those arrangements have been made to get that in

play.  Fair enough?

MR. SMITH-MONAHAN:  Because I imagine the marshals are

1  going to take him back to Butler County today.

2      Is that right?

3          A U.S. DEPUTY MARSHAL:  Yeah.

4          MR. SMITH-MONAHAN:  So he won't probably be able to

5  get back down to see pretrial today, but maybe he could have a

6  day or two to get over there.

7          THE COURT:  All right.  But I don't want him released

8  until that's in play.  Okay?

9          MR. SMITH-MONAHAN:  Okay.  I'll go talk to pretrial

10 right after the hearing.

11         THE COURT:  Okay, good.  All right.

12     Anything else, Mr. Oakley?

13         MR. OAKLEY:  No, sir.  Thank you.

14         THE COURT:  I'd like to thank the marshals service for

15 working your schedule around for us today, guys.  I realize we

16 didn't go off at the time we were supposed to.  I appreciate

17 it.

18     All right.  Anything else, Richard?

19         MR. SMITH-MONAHAN:  No, Your Honor.  Thank you.

20         THE DEFENDANT:  No, sir.

21         THE COURT:  Okay.  Thank you.

22         COURTROOM DEPUTY:  Court is now adjourned.

23     (Proceedings concluded at 3:52 PM.)

24                              - - -

25

1                    C E R T I F I C A T E

2           I, Luke T. Lavin, RDR, CRR, the undersigned, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5

6                              s/Luke T. Lavin
                               _____
                               Luke T. Lavin, RDR, CRR
7                              Official Court Reporter

8                              - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25