1      UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF OHIO

3            WESTERN DIVISION

4

5                 - - -

6  UNITED STATES OF AMERICA,   .  CASE NO. 1:09-CR-30-1
                              .
7            Plaintiff,   .
   - v -                      .  *Sentencing*
8                             .
   CHRISTOPHER FREEMAN,        .  Monday, September 14, 2009
9                             .  3:10 p.m.
             Defendant.   .  Cincinnati, Ohio
10
   . . . . . . . . . . . . .
11

12

13          TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MICHAEL R. BARRETT

14

15  For the Plaintiff:    Timothy D. Oakley, Esq. (AUSA)
                         United States Attorney's Office
16                        221 East Fourth Street, Suite 400
                         Cincinnati, Ohio  45202
17

18  For the Defendant:    Richard Smith-Monahan, Esq.
                         Assistant Federal Public Defender
19                        Chiquita Center
                         250 East Fifth Street, Suite 350
20                        Cincinnati, Ohio  45202

21  Also Present:         Robert C. Frommeyer, U.S. Probation
                         Officer
22
   Law Clerk:            Stephanie K. Bowman, Esq.
23
   Courtroom Deputy:     Barbara A. Crum
24

25  Court Reporter:       Maryann T. Maffia, RDR, Official

Proceedings recorded in stenotype, transcript produced by computer.

P R O C E E D I N G S

1
2          COURTROOM DEPUTY:  The next matter on the docket is
3     District Court Case Number 1:09-CR-30, Defendant Number 1:
4     *United States of America versus Christopher Freeman.*
5        We're here this afternoon for sentencing.
6          THE COURT:  All right.  Would counsel like to state
7     their appearances for the record, please.
8          MR. OAKLEY:  Good afternoon, Your Honor.  Tim Oakley
9     for the United States.
10         THE COURT:  Good afternoon, Mr. Oakley.
11         MR. SMITH-MONAHAN:  Richard Smith-Monahan on behalf
12    of the defendant, Christopher Freeman.
13         THE COURT:  And you're Mr. Freeman, correct?
14         THE DEFENDANT:  Yes, sir.
15         THE COURT:  Okay.  You want to take your hands out of
16    your pockets, please.
17         THE DEFENDANT:  Yes, sir.
18         THE COURT:  Thank you.
19       All right.  Let's talk about how we got here.
20       On May 11th of this year, Mr. Freeman appeared before me
21    in the United States District Court for the Southern District
22    of Ohio.  He entered a plea to the indictment pursuant to a
23    Plea Agreement.  The matter was referred to the Probation
24    Department for a presentence investigation and report, which
25    the Court received.  The report was initially prepared on June

8th of 2009 and revised about a month ago on August 19th,
2009.  There was also a Sentencing Memorandum, which has been
supplied.

Mr. Oakley, have you received a copy of all the documents
in this case?

MR. OAKLEY:  I have, Your Honor.  Thank you.

THE COURT:  Mr. Smith-Monahan, have you received a
copy of all the documents in this case?

MR. SMITH-MONAHAN:  Yes, Your Honor.  Judge, you did
get a copy, I assume, of the treatment report from Northland?

THE COURT:  Yeah, I did.  I'm looking for it right
now.

Does Barb have that?

COURTROOM DEPUTY:  Judge, I'll just give you my copy.

THE COURT:  Okay.

Hang on one second, guys.

Did you get a copy of that, Mr. Oakley?

MR. OAKLEY:  Your Honor, I did, and Mr. Smith-Monahan
has handed me another copy just now.

THE COURT:  Richard, just so you know, I received a
copy of that, and I've discussed it with the Probation
Department.  The Probation Department expressed that the
author of the report -- how do I put this? -- is a straight
shooter and has done good work in the past.

MR. SMITH-MONAHAN:  Yes, sir.  I've spoken with both

of them.  He has two counselors up there.  The one you got a

report from was his individual counselor.  He also has a group

counselor.

THE DEFENDANT:  Yeah.

MR. SMITH-MONAHAN:  And I've spoken with him.

THE COURT:  All right.  Before I address the factual

findings for the sentence, I'd like to review something we

talked about at the time of the plea, and I just want to

review this for the record.

Under the Sentencing Reform Act of 1984, the United States

Sentencing Commission issued guidelines.  At that time,

federal judges were required to follow those guidelines in

determining sentences in criminal cases.  Due to Supreme Court

decisions since that time, the Court has said that it's

unconstitutional for judges to be required to follow the

guidelines in sentencing, but that it was constitutional for

the judges to be required to consider the guidelines as one of

the factors in determining a sentence, which I have and will

do along with the factors discussed in 18 U.S.C. 3553.

The Court has the authority to impose a sentence which

could be more or less severe than that suggested by the

guidelines, and the sentence is determined by the standard of

reasonableness and the minimum and maximum penalties provided

by the Code for the offense of conviction.

In terms of sentencing facts, Richard, is there anything

other than what's in the report that you wish to bring up at this time?

MR. SMITH-MONAHAN:  We have nothing other than what was raised in our objection letter and our Sentencing Memorandum, Your Honor.

THE COURT:  Okay.  And review the objection letter for me.

MR. SMITH-MONAHAN:  And the objection letter is also the subject of the Sentencing Memorandum, but it's an objection to the four-level enhancement applied by Probation under the guidelines for basically selling or trafficking in firearms.

THE COURT:  Okay.  We'll cover that in just a minute then.

Mr. Oakley, is there anything else you wish to present at this time?

MR. OAKLEY:  We may present some testimony that would correspond with the facts in the PSR, but nothing else right now.

THE COURT:  Okay.  Reserving the objections until we talk about it in a few moments, the Court -- as it relates to the factual statements contained in the presentence investigation, we'll adopt those factual statements as the Court's findings of fact, including that Mr. Freeman entered a valid plea to Count One of the indictment and was and is

adjudged guilty in Case Number 1-09-CR-30-1, Possession of Stolen Firearms, a Class C felony, which is a violation of 18 U.S.C. 922(j) and 924(a)(2) and 2, which subjects him to up to ten years of possible imprisonment, a $250,000 fine, three years of supervised release, a $100 special assessment.

Because of the dates of this offense, the 2008 edition of the Guidelines Manual was used to calculate the offense level and the guideline imprisonment range.

The guideline for a violation of 18 U.S.C. 922(j) is found at Sentencing Guideline 2K2.2.1. Pursuant to 2K2.1(a)(7), the base offense level is 12 if he has not previously been convicted of a felony offense and all the stolen firearms were handguns.

Pursuant to 2K2.1(b)(1)(C), the offense level is increased by four levels if the offense involved the defendant's possession of 36 stolen firearms, because the offense involved 36 firearms.

2K2.1(b)(4)(A) deals with a two-level adjustment for possessing -- excuse me. A two-point adjustment under 2K2.1(b)(4)(A) is not an appropriate enhancement in this case because the underlying offense is a violation of 922(j), and the base offense level takes into account that the firearms that were stolen pursuant to Note 8(A) under Guidelines 2K2.1.

Under 2K2.1(b)(5), if there was trafficking of firearms involved, there was an increase by four levels.

In this case, Mr. Freeman was responsible for stealing 36 firearms on at least four separate occasions:  one in Sardinia, where he sold the guns to his cousin and his uncle; one in Avondale, where he and Mr. Roehm bartered and sold guns to a drug dealer; eight guns were given to Mr. Roehm, and those were to be sold eventually to an undercover agent; Mr. Freeman engaged with Mr. Roehm in presenting three guns to an undercover agent, also to be sold.

So he participated in transporting, transferring and disposal of two or more firearms to another individual.

Based upon these transactions, the four-level enhancement applies in this case.

According to 2K2.1(b)(6), if he used or possessed any firearm or ammunition in connection with another felony or if he possessed or transferred any firearm or ammunition with the knowledge or intent or reason to believe that it would be used or possessed in connection with another felony, there is a potential increase by four levels.

And I think, Richard, that's where your objection speaks; is that correct?  That's the basis of your objection?

MR. SMITH-MONAHAN:  Our objection is to Paragraph 40 and 41, really, where Probation concluded that the four-level enhancement for trafficking in firearms is appropriate.

THE COURT:  Okay.  Why don't you speak to your objection now.

1    MR. SMITH-MONAHAN:  Okay.  This guideline section

2    2K2.1(b)(5) provides for a four-level enhancement if the

3    defendant trafficked in firearms, which, you know, means

4    selling the guns.

5             THE COURT:  Right.

6             MR. SMITH-MONAHAN:  And our position is that

7    Mr. Freeman was obviously convicted of selling the guns.  That

8    was the charge in the indictment.  It was for possession and

9    disposing of the firearms.  So we submit under the cases cited

10   in the Sentencing Memorandum, *United States versus Gibson*,

11   *United States versus Farrow*, *United States versus Duckro*, all

12   Sixth Circuit cases that where "the same" -- and this is a

13   quote from the Court in *Gibson*:

14       Where "the same aspect of a defendant's conduct factors

15   into his sentence in two separate ways," that constitutes

16   impermissible double counting.

17       In this case, obviously, the sale of the stolen firearms

18   was an element of the offense for which Mr. Freeman was

19   charged.  In other words, had it gone to trial, the government

20   would have had to prove as an element of the offense that he

21   sold firearms.  So when he enters a plea of guilty to that

22   count, he is necessarily -- that conduct is encompassed within

23   the count of conviction, selling firearms.

24       Mr. Freeman is not separately a convicted felon.  There is

25   no separate reason to -- I point to the example of Mr. Roehm,

who was the co-defendant, who was a convicted felon.  His

possession of firearms in and of itself is a felon.

But in regards to Mr. Freeman, it's this statute that he

is charged under.  The possession and the disposition of

stolen firearms is what made his conduct illegal and, thus,

what drives his base offense level under the guidelines of an

offense level of 12.

Obviously, I didn't see Mr. Roehm's Presentence Report,

but I would speculate he had a higher Base Offense Level

because his possession of firearms was independently an

offense.  He is a prohibited person.  Mr. Freeman was not.

So it's solely his conviction.  It's solely the selling of

the firearms, the conviction itself, which is what drives him

to this offense level of 12.

Therefore, we believe, because of that fact, that counting

again the fact that he sold the firearms and giving him a

four-level enhancement for it is double-counting under these

circumstances, and it's unfair.  You know, it's his sale of

the firearms that got him in trouble.  It calculates that the

-- the basis for the computation of the guideline, and then to

stack on another four levels because he sold the same firearms

seems unfair.  We would think it submits under this concept of

punishing the same aspect of this conduct twice.

So we ask the Court to consider an -- although that is

what the guidelines say, under the Sixth Circuit case law we

would submit that it's impermissible double counting.

I think two of the Sixth Circuit cases are strong indicia -- the holdings in two of those cases are strong indicia that this is double counting. One is that *Gibson* case. It was kind of an odd statute, but it was prosecuting mine operators. They are prosecuted and they are given -- they are mine operators and that's the basis, one of the elements of the offense, they'll also get a leadership enhancement. The Sixth Circuit said no, the fact that they were the operators of the mine is what permitted the prosecution. That was an element of the offense they were charged with. Therefore, you can't also stack on a leadership enhancement because but for them being mine operators, they wouldn't have been prosecuted.

Similarly, the *Farrow* case, the defendant is charged with felonious assault-type offense, an assault-type offense for assaulting a federal officer with a vehicle, so that's the basis for the conviction. He also gets a big enhancement for using a vehicle or using a "dangerous weapon" to commit the offense. So he is convicted for the conduct, and he's given enhancement for the same conduct. The Sixth Circuit said no in *Farrow*, that's impermissible double counting.

We would submit that the circumstances in this case are factually indistinguishable from those two cases. Here you have a defendant convicted of selling firearms, and then you turn around and you give him a four-level enhancement for

selling firearms.

Under the circumstances of this case, we would submit that that four-level enhancement is not appropriate.

We believe the correct guideline computation of 12 plus 6 is 18, minus 3 for acceptance of responsibility is 15.

THE COURT: I think Mr. Oakley's memorandum in response correctly dealt with the mine case in *Eversole*. I think under 2K2.1(b)(6), if Mr. Freeman used or possessed any firearm or ammunition in connection with another felony, or possessed or transferred any firearm or ammunition with knowledge or intent or reason to believe that it would be used or possessed in connection with another felony, there is an increase of four levels.

I know you disagree with some of reasoning, but the fact of the matter is the firearms were obtained by the breaking and entering into the Antiques Gun Store on February 11th, 2009. I think that that conduct in and of itself constitutes a separate felony type of offense, and I believe that the counting done by the Probation Department in this case was appropriate.

So the objection will be overruled.

Mr. Oakley, I didn't really give you a chance to respond, so if you want to -- if you think anything else needs to be said for the record, you could make that argument now.

MR. OAKLEY: Your Honor, if I could. First, I

believe the statute can be -- or Mr. Freeman could have been convicted for receiving stolen firearms or possessing stolen firearms also, and that's what the evidence would have been. I don't believe it necessarily has to be disposing of stolen firearms.

But, second of all, Your Honor, in looking at the *Eversol* case, where separate enhancements "penalize distinct aspects" of a defendant's conduct, no double-counting will be involved.

As it's noted, he gets a 12-point base offense for possession of stolen firearms, and then there is an additional four-level enhancement for the trafficking because the trafficking creates a distinct aspect with its own separate harms. I think that's the key to double counting.

When Mr. Freeman was out, not only did he burglarize the arcade or the antique store with the firearms, but in his trafficking the weapons, these weapons are being transmitted to drug dealers, drug users, and are now, at this point, untraceable. It's a pretty dangerous situation to society at large and to anyone, including officers, who now come into contact with these people because they are armed with weapons that cannot be traced back to the source of where they came from.

I think that's what the guideline enhancement is about. We think the enhancement is appropriate, and we appreciate the Court's finding.

1    THE COURT:  And I agree with Mr. Oakley's comments on

2  that.

3    Richard, if you want to -- so the objection will be

4  overruled.  If you want to further supplement the record, you

5  can, or if you think you've got it covered --

6    MR. SMITH-MONAHAN:  Well, I just wanted to -- you

7  mentioned 2K2.1(b)(6), and my reading of the Presentence

8  Report is, Probation did not give Mr. Freeman an enhancement

9  under 2K2.1(b)(6) for possessing the firearm in relation to

10  another felon.  Probation concluded that enhancement was not

11  appropriate.  The government did not object to that finding.

12    THE COURT:  I think it's under 2K2.1(b)(5) where the

13  enhancement occurs; is that correct?

14    MR. SMITH-MONAHAN:  That's where Probation -- when

15  you responded to me earlier, you mentioned the next

16  enhancement, which Probation did not actually score, nor did I

17  when I was arguing -- -

18    THE COURT:  I may have misspoken on that.

19    MR. SMITH-MONAHAN:  So just in response to what

20  Mr. Oakley said about 2K2.1(b)(5), which -- so I've been clear

21  on the record, is paragraphs 39, 40 and 41 of the Presentence

22  Report.

23    THE COURT:  42 was the section I was talking about.

24    MR. SMITH-MONAHAN:  Right.

25    THE COURT:  So I misspoke on that, and you're

 1    correct.

 2           MR. SMITH-MONAHAN:  Mr. Oakley mentioned the

 3    burglary, and I want to say this:

 4        We haven't disputed any of those facts.  What we're

 5    disputing is, he wasn't charged with burglary.

 6        If we were standing here and this prosecution were

 7    burglary with firearms and he were getting a four-level

 8    enhancement for selling firearms, we would not be making this

 9    argument because the burglary would not have been considered

10    already in the underlying charge.

11        But he was not even charged with the burglary of firearms.

12    The indictment charged him only with the possession -- it's

13    possession, receipt and disposition of the firearms, or sale

14    of the firearms.  That's all the indictment charged him with.

15        So I, frankly, think any discussion about the burglary in

16    regard to this point is irrelevant because he wasn't charged

17    with it.  If he were charged with it, I wouldn't be making

18    this argument.

19        The point is, this sale of the firearms -- look at the

20    Statement of Facts in this case.  All it talks about is

21    selling firearms, the Statement of Facts attached to the Plea

22    Agreement.  That's what he pled guilty to, is the Statement of

23    Facts they read.  It talks only about the sale of firearms,

24    and that is what he is getting a four-level enhancement for.

25    That is what he pled guilty to.  That is what the indictment

charged.  Therefore, we would submit that that is double

counting under these circumstances.

THE COURT:  I'm satisfied that the record on the

objection that I've overruled is sufficient.

But, Mr. Oakley, if you think anything else needs to be

added, you may.

MR. OAKLEY:  Not at this point, Your Honor, no.

THE COURT:  Okay.

There was no adjustment for role in the offense because he

was neither a leader nor a minor participant.  He was held

accountable for his own behavior in the case.

Acceptance of responsibility, he has been given a

two-level reduction and the additional one-point reduction.

His criminal history is only one point, so he has a Criminal

History Category of Roman Numeral I.

Term of supervised release following a term of

imprisonment would be up to three years, including mandatory

conditions regarding not violating any other federal, state or

local crimes, collection of DNA, and not using controlled

substances, and testing to ensure those provisions.

Maximum fine, I've already said, is $250,000.  There is

always a $100 mandatory assessment in this case.

So those are the way the guideline recommendations shake

out, which would be -- excuse me?

(Mr. Smith-Monahan confers privately with the defendant.)

1    THE COURT:  An offense level of 19 with a Criminal

2  History Category of I, and the guideline provision is 30 to 37

3  months.  As you know, Richard, there has been a request for an

4  upward departure based upon conduct.

5    So other than the objections already stated, anything as

6  to the calculation of the guidelines?

7    MR. SMITH-MONAHAN:  No, Your Honor, nothing more

8  about the calculation of the guidelines.

9    THE COURT:  Okay.  Is there anything that you or your

10  client wishes to say in respect to mitigation of the potential

11  sentence?

12    MR. SMITH-MONAHAN:  Yes, Your Honor.

13    THE COURT:  Go ahead.

14    MR. SMITH-MONAHAN:  We have -- the second part of the

15  Sentencing Memorandum, we objected to the upward departure and

16  grouped that together with a discussion about request for a

17  variance below the recommended guideline range.  So, if I may,

18  I'll just address those as one consideration.  I think it's,

19  at this point, a determination of the 3553 factors.

20    Obviously, the Court knows, Mr. Freeman is Criminal

21  History Category I.  He comes into this case with a few minor

22  skirmishes with the law.  This is his first adult felony

23  conviction.  He stands before the Court, under the guidelines,

24  as someone that presents a low likelihood of recidivism based

25  on the Commission's view of individuals, lowest criminal

history category possible.

He's only 21 years old.  That's obviously a very young age.  He has been an adult for three years, and it's a very impressionable age, and it's an age which is probably really critical what happens here forward and what the rest of his life looks like.

Prison can have two different effects on people.  As I'm sure the Court knows, one of those effects is teaching -- getting someone around a bunch of hardened criminals where they learn a lot of negative things.  That's something that prison can do, and that's something that the sentence we are proposing, that we are hoping to try to keep him away from that influence.

I know there has been some factual argument back and forth between the government and I about the influence Mr. Freeman was subjected to in his life.  I know you sentenced Mr. Roehm this morning, but you can see some of the comments from my client's father in the Presentence Report.  I pointed those out in the Sentencing Memo, that co-defendant Roehm and his gang that they hang with were some of what got Mr. Freeman going down the wrong path in his using drugs, being involved in criminal activity.  That was a lot of the basis for the fight between my client and his father, is my client's father seeing that this is a bad influence for him and he needs to keep him away from these people.  But he was hanging around

with him and, sure enough, here he is in trouble.

He has got, as you know, a heroin addiction. That is -- no bias. I think he has made some pretty candid admissions in this case about trading guns for drugs, using -- you know, selling guns to have money to buy drugs. He was high at the time he did this, and he was using heroin pretty heavily. I know we all know that heroin is a highly addictive drug, and he appears to have been firmly in its grasp at the time he did this.

And I realize that's an argument that cuts two ways. The last thing you want is people out there is high on drugs committing crimes.

Now we can look at what Mr. Freeman is doing to try to deal with that problem. Admittedly, it is part of the underlying problem. That why he's in trouble today. Because he is using drugs illegally, he is needing to feed that habit, and he chose to make some really, really bad decisions surrounding that.

You let him out on bond at the time of his plea hearing. He had two options on what he could do at that point: he could go back and use, or he can really try to clean his life up.

I think if you've looked at what's happened, sure, it hasn't been perfect. You know, it hasn't been perfect, but I think he's really shown you that he's tried.

I know when I first met him at the jail, he was coming down and detoxing from heroin sitting in the county jail. That was hard.  He was a complete mess.  That's where he came from:  first the detox in the jail and now trying to get back out really into the same world he was living in but be drug-free.

And I'm going to let his dad talk in a few minutes.  I know you heard from him at the plea hearing about how hard that is on him and how hard it's been and then how committed they are to keeping him from doing that again.

But look as what he's doing.  He has been on house arrest since the day you let him out.  He is still on house arrest as we stand here today, so he's spent four months now on house arrest.  He has been engaged in treatment at Northland.  I think I gave Mr. Oakley my only report, the only copy of that report, but look at what it says in here.

"Excellent progress so far" is what this counselor indicated.  He attends twice weekly at the treatment program. This is on the bottom of Page 1.  "Mr. Freeman started attending intensive out-patient program June 15th and has made excellent progress thus far."

In the second page, "In review of Mr. Freeman's progress, he completed a thorough first step assignment and was able to acknowledge his powerlessness and unmanageability to his drug addiction, verbalized sincere recognition of his legal

problems, and sees how his drug addiction has placed in criminal behavior."

It's given him some opportunity to attend AA and NA meetings that were -- as he could get them approved on his electronic monitoring. "Patient reports having good experience with attendance at NA meetings."

He's had a little bit of trouble finding employment. Some of that has been being on house arrest. Then when you go to do a job interview, Pretrial has got to call the employer. You can imagine how hard it is to get an employer to hire you in that situation.

This current situation, as of today -- he could have started today but for court. So he thinks they've got a placement for him at L3 starting next Monday, so he would be working and continuing his treatment.

You see that the treatment specialist there suggests that they can continue these services with him at this facility. They have extended continuing care monitoring for up to a year with his program. I know that the Court sometimes is concerned about disrupting something that's going on. I think Mr. Freeman is standing before you with something that's going on that's good.

I know it is a huge chance when a defendant stands up in a case like this and asks for a big break, Your Honor, and we realize some of the facts of this case are disturbing to the

Court. I want to talk about that in a minute.

We have a defendant with a minimal record, a drug addiction that we can see is probably pretty clearly the cause of why he is here, being involved with a crowd of people that got him into this type of conduct, so he's a guy to take a chance on. He's 21 years old. He's young and has a chance not to go to prison and learn some negative things. He has shown you how serious he is about rehabilitation.

I want to just comment on the facts of the case because I know that Mr. Oakley is going to talk a lot about them and I know they are a big concern to the Court. We're not here disputing the facts. We're not here to tell you he didn't do this. He did it. He was really wrong. He is confessing that he was wrong.

You know, I know there is a concern about the incident with the planned robbery. I wanted to point this out to the Court, that that's what my client told the agents that upon his arrest. It's my belief from having read the paperwork that's how they found out about that, is he told them, "Hey, you know, I was planning on robbing him. I didn't know he was an agent." He didn't do it, you know. In one sense, the upward departure and these kinds of things are really punishing him for what he was thinking and planning on doing but didn't act on.

So, you know, he was honest about it and has been honest

from the time of his arrest about that. He was very candid.
Now he is obviously subjected to punishment for his honesty.
But, at the very least, he is a gentleman who has been
forthright and he's a gentleman trying his best now to deal
with the problem that got him where he is standing.

With all of those circumstances, I know your guideline
range is 30 to 37 months. You have discretion to go down as
low as you want. There is nothing mandatory in this case. We
ask you to exercise that discretion and go down substantially
in this case.

Yes, Judge.

THE COURT: There is one other item that you may want
to comment on before we move on. This morning in the
sentencing of the co-defendant, Mr. Whitley, who was the owner
of the firearms store, was present. I believe you have been
given a copy of the transcript which occurred at that time,
but for purposes of this sentencing I'm going to read what I
believe was the relevant portion.

This is Mr. Whitley starting on Line 19.

MR. SMITH-MONAHAN: Which page, Judge? I'm sorry.

THE COURT: Page 2.

"I am a federal firearms licensed dealer, and I have a
list of damages and any articles that were stolen out of my
building. The total is over $30,000. I had no insurance
because I had a small break-in a year before, and I went ahead

and installed steel bars around all the windows and the doors, and I had a backup battery security system.

This particular night on February 12th, the electric was out in Bethel from a storm. I had a backup satellite in case this happened. That particular night, the Russian satellite and the American satellite crashed in outer space. We had no security from 2:30 to 5:30 in the morning, and that's when the break-in occurred, sometime between 2:30 and 5:30 in the morning."

Did we give Richard a copy of that list?

COURTROOM DEPUTY: No, we did not.

THE COURT: He provided us a list which had the damages to his shop and also had a listing of the firearms that were taken which Mr. Oakley had indicated he would be able to check off some of those firearms as being recovered.

So do you wish to -- in your mitigation, do you wish to discuss restitution as well?

MR. SMITH-MONAHAN: Well, we're not getting -- this is the first I had seen of those dollar amounts. I don't believe we are going --

THE COURT: Actually, I think the presentence investigation had it listed the 27,000, didn't it?

MR. OAKLEY: Yes, with the recovery of almost 8,000.

MR. SMITH-MONAHAN: We're not going to dispute what the Court wants to order in restitution that it deems fair.

Mr. Freeman is willing to make every effort, once he is employed, to try to make recompense for his wrongs here. We have no intention of disputing -- if the man said he's lost money and that's verified through the Probation Department and the Court, we're not going to dispute him paying that back.

Obviously, a long period of incarceration would hinder his effort to try and do that, but he is standing here with every intention of trying to make good on the damage he did. That's what we'll say in that regard.

I had finished what I intended to say. I believe my client's father would like to say a few words to the Court, if you'll permit him to do so.

THE COURT: Certainly.

How you doing? Could you state your full name and spell your last name so the court reporter can take it down.

MR. THOMAS P. FREEMAN: Thomas P. Freeman, F-r-e-e-m-a-n.

THE COURT: Go ahead, Mr. Freeman.

MR. THOMAS P. FREEMAN: Sir, I'd just like to say that my son did do a grave consequence. He's got to be accountable for his actions. But, you know, he's just -- he is 21 years old. He's a young man. I just -- I think after talking with my son since he is on his, since he was released, that, in my honest opinion, he was just at the wrong place at the wrong time with the wrong crowd.

1    I just feel as a parent -- I just want to say that

2  everything that I've read and everything that I've just looked

3  into, that the statistics are pointing at when a person goes

4  to prison, especially a young person, the odds are just really

5  high that they are going to be led into a more criminal

6  activity because of being with the criminal element.

7    I'm just hoping, Your Honor, you could show a little bit

8  of leniency, give him a chance to do what's right.  I think

9  that he's more than willing to show the Court is he is wanting

10 to do what's right.

11   Again, I'd like to just add, sir, that I'm just -- I would

12 like for you to show a little bit of leniency.

13        THE COURT:  And I appreciate your efforts in regard

14 to your son's conduct before.  Thank you.

15        MR. THOMAS P. FREEMAN:  Thank you, sir.

16        MR. SMITH-MONAHAN:  Do you want to say something?

17        THE COURT:  Mr. Freeman want to talk to me?

18        MR. SMITH-MONAHAN:  He has a few comments, Your

19 Honor.

20        THE DEFENDANT:  Yes.  I don't know.  I ain't never

21 been in trouble before.  I ain't never went to jail.  I got --

22        THE COURT:  Those are two separate things,

23 Mr. Freeman.  You have been in trouble before, but you've

24 never been to jail.

25        THE DEFENDANT:  Yeah, I ain't never been to jail

before.  Like I say, I did three months in Butler County, you know.  That's probably what scares me the most, is going back to jail.

The time I was out on bond, you know, I had a lot of time to think about how it affected me and my family.  But I'm not disputing anything on what you give me because I accept the responsibility.  I can't fight what I did wrong, you know.  Can't put it off on no one else.

If you would show some lenience, I'd appreciate it.

I have been clean since then and going to continue doing my Northland and drug treatment.  I don't want to live that life no more.

That's all I got to say.  Thank you.

THE COURT:  Thank you.

Mr. Oakley, do you have anything you want to say at this time?

MR. OAKLEY:  Your Honor, I guess if there is no real dispute about the facts other than who committed the burglary, we don't need to put on any evidence, I don't think.  In looking at the PSI, if there is no dispute, then there is no dispute that Mr. Roehm is the one who received all the money for the stolen weapons.  He is the one who got paid.  Mr. -- I'm sorry.  Mr. Freeman is the one that got all the money.  Mr. Freeman paid Mr. Roehm $80.  So to make some type of allegation that Mr. Roehm was the driving force behind

1    this, I think, misspeaks of the facts.

2        Second of all, Your Honor, the robbery, in paragraph 28,

3    wasn't because Mr. Freeman changed his mind; it was because he

4    couldn't get into the trailer where the shotgun was located.

5    Otherwise, we would have been here -- hopefully not, but we

6    would have been here on entirely different circumstances with

7    different charges.

8        This is an operation that was conceived, driven and

9    benefitted by Christopher Freeman.

10        I know he's a young man, I know he doesn't have much of a

11    criminal history; but thanks to him, 20-plus guns are still

12    out on the streets of Cincinnati and throughout Southwest

13    Ohio.  The Court should take that into consideration when it

14    considers the nature of the offense and the risk to society

15    that Mr. Freeman has caused, not to mention the damage that he

16    did to Mr. Whitley in burglarizing his store.

17        We think the guidelines are appropriate, and we also think

18    that the recommendation of the upward departure based on the

19    overall operation led by Mr. Freeman is appropriate.  We would

20    ask the Court to give him, at a minimum, the 37 months.  If

21    the Court is so inclined, we would agree with an upward

22    departure from that.

23        THE COURT:  Well, the sentence I'm about to impose,

24    in my judgment, takes into consideration the nature and

25    circumstances of this particular offense and, Mr.  Freeman,

reflects seriousness of the offense, promotes respect for the law, and will provide just punishment as well as afford adequate deterrence to any additional criminal conduct that Mr. Freeman may have contemplated or with others similarly situated may have contemplated.

It will protect the public from further crimes and provide him with needed educational or vocational training.

I appreciate what Mr. Freeman, Senior tried to do in this particular matter, and I appreciate the supervision he tried to give his son earlier. But to be clear and fair, at the time that I let Mr. Freeman out on bond, I obviously had a copy of Mr. Roehm's record but not a Presentence Investigation. I had a copy of Mr. Freeman's record but not a Presentence Investigation.

At that time, I was willing to listen to the fact that the young heroin addict was influenced by the older, allegedly more mature heroin addict. In looking at the comparative records, it seemed to make sense.

Since that time, I think I've come to conclude that Mr. Freeman was actually the person that schemed to break into the gun shop and steal the firearms. As a juvenile, he broke into a car, stole a stereo, and also stole some rims and tires at different times.

As indicated by Mr. Oakley, he controlled the flow of the stolen firearms for sale and bargained for drugs for the time

that this offense lasted.  Both Mr. Freeman and Mr. Roehm went into Avondale, sold guns to unidentified heroin dealers in exchange for drugs.

When I do the sentence in this case, I need to look at what I've given Mr. Roehm in terms of fairness.  I've taken his record into consideration.

But also, Mr. Freeman, and Richard can tell you and Tim Oakley can tell you that at least on a weekly basis that people like the folks you sold your guns to come in front of me, and they start looking at five or plus years just out of the gate for having the guns, and you're the guy that's giving them the guns.

That's a concern, not just because of the fact that the City of Cincinnati and the surrounding area is heavily engaged in Project Disarm to get the guns off the street, but in terms of just understanding the flow of guns and how these things get into the hands of these known felons, I think it's important, but also the number of guns that are still unaccounted for, the number of guns that you put into circulation I think is important in this case.

Even though you were high on drugs, the fact of the matter is -- and Richard said that you gave up the evidence that led the probation officer to conclude that you were going to rob the undercover agent.  But, as Mr. Oakley pointed out, you were going to rob the undercover agent, you had trouble

getting to the shotgun that you were going to use to rob this

guy.

You have an armed, high robber come in contact with an

armed undercover agent, there is no telling what would have

happened. That's part of the reason we are tough on the

criminals that come in here just carrying guns. You know,

they say they're carrying them for their own protection, but,

more often than not, innocent people get involved in their

criminal conduct.

5K2.0(a)(2)(B) permits a departure in cases where there is

circumstances the Sentencing Commission does not identify but

is nevertheless appropriate, and I think this is such a case.

Short of a locked door, I think we would have had a very

serious confrontation there. I think that that's something I

need to take into consideration in this case, plus the types

of sentences that I give people for possessing firearms in

these situations, and also Mr. Roehm --

What did I give him, Tim, 67 months?

MR. OAKLEY: 67 months, yes.

THE COURT: I gave him a more severe sentence based

upon his record, but I'm not sure, Christopher, who was

leading who down the path in this situation. The evidence

points, to me, that actually you were leading him down -- the

younger junkie was leading the older junkie down the path in

this case. I think that the upward departure is warranted in

1    this case.

2        For that reason and what I've stated in the record, I am

3    going to impose a sentence of 43 months to the Bureau of

4    Prisons, three years of supervised release upon completion of

5    the sentence.

6        Upon release from incarceration, you are ordered to report

7    in person to a probation office in the district within which

8    you released, and you have to do that within 72 hours.

9        As I indicated before, the conditions are:

10       You are not to commit any other federal, state or local

11   crimes;

12       Never to possess any firearms or other dangerous devices;

13       Not to possess any illegal controlled substances; and to

14   monitor assurance of that, within 15 days upon your release of

15   supervised release, you'll have at least one drug test and at

16   least two thereafter, but more can be administered;

17       You have to comply with the standard conditions of

18   probation as adopted by the Courts for the Southern District.

19       There will be -- I'm not going to have a fine in this

20   case, but I am going to order restitution in the amount of --

21       Bob, do you have the number handy?  It was 27 --

22            MR. FROMMEYER:  Your Honor, if I could speak to the

23   restitution issue?

24            THE COURT:  Go ahead.

25            MR. FROMMEYER:  I'm not sure the Court can order

restitution in this case, and the reason is, is because what

he was charged with was possession and disposing of the

firearms.  Restitution is held to the count of conviction.

What the property that was alleged in the indictment in Count

One was the firearms that were actually part of the

transactions with the undercover agent.

All of those firearms were recovered and, therefore, I'm

not sure the Court can order restitution based upon the

burglary and all that because that is not part of the charge

and the conduct.

THE COURT:  Mr. Oakley, do you have an opinion on

that?

MR. OAKLEY:  Your Honor, I don't.  This is new to me.

I would have thought that the relevant conduct would be such

that the restitution would be appropriate.

THE COURT:  Well, here's what I'm going to do.  I'm

going to order a condition of supervised release that

restitution in the amount of $27,000 minus the guns that have

been recovered, and I'm assuming -- I'm not assuming.  I'm

hoping that more firearms will be recovered over the next few

months, that those will all be credited toward Mr. Freeman's

account.

What we can do is, the Probation Department, when it's

time to put together a schedule, we can see what firearms have

been recovered, what firearms haven't, and then deal with it

as a condition of supervised release at that time.

Obviously, if I'm wrong on this, Richard has heard your argument and he can take it up and get that straightened out.

Richard, is there a request for the 500-hour drug treatment?

MR. SMITH-MONAHAN:  Yes, Your Honor.

THE COURT:  Okay.  That's granted.

Mr. Freeman is ordered to provide Probation with a DNA sample and pay the special assessment of $100.

Paragraph 14 of the Plea Agreement, I think, dealt with forfeiture, so any items that are mentioned in there to be forfeited will, in fact, be forfeited.

Richard, do you want to renew your previously-raised objections for the record?

MR. SMITH-MONAHAN:  Yes, Your Honor, I will.

Pursuant to the Sixth Circuit's decision in *Bostic*, first of all, we would renew our objection to the four-level guideline enhancement under Section 2K2.1(b)(5), and I would incorporate all of the reasons that we indicated earlier in the hearing that we felt that a four-level enhancement was inappropriate.  We believe the correct guideline computation should be 18 to 24 months.

Second, we would object to the Court's determination that an upward departure is appropriate and the Court's denial of a downward variance in this case.  We would submit that the

```
 1   Court should balance the seriousness of the offense that the
 2   Court mentioned against some of the factors that we raised:
 3   my clients's age; his drug problem that led him into the
 4   problems he was engaged in; his rehabilitative efforts; his
 5   efforts of drug treatment; his lack of a criminal record.
 6       We would submit when making that balancing of the 3553,
 7   that the downward variance -- at least a sentence within the
 8   guideline range or, failing additionally, a downward variance
 9   in the guideline range was actually appropriate in this case.
10            THE COURT:  Mr. Oakley, do you think you need
11   anything regarding those on the record at this point?
12            MR. OAKLEY:  No, Your Honor.
13            THE COURT:  Okay.  Where are we in terms of custodial
14   status, guys?
15            MR. SMITH-MONAHAN:  We would request -- I believe
16   Pretrial has submitted a bond report to you which indicates
17   they have no objection to him remaining out on bond.  We would
18   ask that you allow him to continue to do so.  If you were
19   inclined to agree with that, I had the additional request of
20   allowing him to be off of house arrest awaiting his
21   designation to Bureau of Prisons.
22       I spoke with Mr. Morris from Pretrial about that.
23   Mr. Morris indicated to me they have no objection to him being
24   off of house arrest while awaiting his voluntary surrender.
25            THE COURT:  Tim?
```

1      MR. OAKLEY:  Your Honor, I just spoke to Mr. Morris.

2 Maybe there was a miscommunication, but Mr. Morris informed me

3 that the reason that Mr. Freeman has done as well as he has

4 was the electronic monitoring and would, I believe, oppose the

5 removal from that condition.  It doesn't hinder Mr. Freeman

6 from going to work.  He can notify the Probation Department

7 and then make the scheduling arrangements.  You know, if the

8 Court makes it final today, we would have no objection to the

9 bond being continued.

10     We would also be curious as to two questions:  One, if we

11 can return the weapons we do have back to Mr. Whitley.  I

12 believe the case is concluded to the point where we can return

13 the evidence, if no objection from Mr. Smith-Monahan and the

14 Court.

15     Second is, we were curious if Mr. Freeman was asking for a

16 location nearest his home.

17      THE COURT:  We'll get to those in just a second.

18 Let's deal with the middle issue first.

19     Richard, if, in fact, photographs containing serial

20 numbers of the aforesaid firearms were saved and preserved in

21 case something would happen somewhere on appeal, are you okay

22 with the return of the weapons?

23      MR. SMITH-MONAHAN:  We have no objection.

24      THE COURT:  Okay.  So I'll order --

25     Tim, just for file purposes, if you could record serial

 1   numbers and photographs of the weapons and keep those safe,

 2   that would be fine.  The actual weapons themselves, those

 3   could be returned.

 4      The defendant is a candidate for voluntary surrender, so

 5   I'll allow him to do that.

 6      I think you owe me an entry of dismissal, don't you, Tim?

 7         MR. OAKLEY:  No.  It was just the one count.

 8         THE COURT:  Just one-count indictment, all right.

 9      And in terms of -- well, the 500-hour drug treatment, and

10   I'm assuming as close to home as possible?

11         MR. SMITH-MONAHAN:  Yes, sir.

12         THE COURT:  And designation, Barb, as close to home

13   as possible.

14      Both sides are notified that they can appeal the sentence.

15      If you are indigent and cannot retain a lawyer,

16   Mr. Freeman, you may apply and one will be appointed to

17   represent you on appeal.

18      Pursuant to Rule 4(b) of the Rules of Appellate Procedure,

19   any Notice of Appeal must be filed with the Clerk of Courts

20   within ten days.

21      Richard, do you want us to go ahead and journalize that

22   now or not?

23         MR. SMITH-MONAHAN:  Yes, Your Honor.

24         THE COURT:  All right.

25      Barb, will you take care of that?

1          COURTROOM DEPUTY:  There will be an appeal?

2          THE COURT:  There will be an appeal, so will you take

3   care of docketing a notice?

4          COURTROOM DEPUTY:  Yes.

5          THE COURT:  Anything else at this time, guys?

6          MR. OAKLEY:  Not from the United States.

7          MR. SMITH-MONAHAN:  What did you decide on house

8   arrest, Judge?

9          THE COURT:  Oh, excuse me.  Good point.  He can

10  report as designated when the Bureau of Prisons notifies him,

11  but he is to continue on the same terms and conditions that he

12  has previously been under.

13         MR. SMITH-MONAHAN:  Thank you, Your Honor.

14         MR. OAKLEY:  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         COURTROOM DEPUTY:  This court is in recess for five

17  minutes.

18         (The proceedings concluded at 4:00 p.m.)

19                    C E R T I F I C A T E

20     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

21  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23  S/MARYANN T. MAFFIA, RDR                              _____

24  Official Court Reporter

25